And we'll move to our fifth case this morning, September Webster v. Receivables Performance. And again, Mr. Phillips. And we have Mr. Rosenberg here in the courtroom. All right, thank you. Then we're prepared to proceed, so go right ahead. Your Honor, it's David Phillips for the Plaintiff Appellant opposing counsel. So let's pick up where we left off. In this case, there is no publication to a fourth party. There's no allegations that a creditor got it after that. What am I relying on here? Other than all the comments we've already had about standing, I won't rehash that part. Here, we're relying on the impact of her credit score and the distress it caused her. In a prior case, they didn't ever depose Ms. Ewing to determine whether she was concerned or not or how it impacted her. In this case, they deposed my client. My client testified that the tangible harm it caused her, that she was distressed by this, that she believes it lowered her credit score. I understood you were arguing publication to TransUnion. That's it, but there's no publication to a creditor in this case. But I understood your position to be there doesn't have to be publication to a fourth party. That's correct. Publication to TransUnion. That's correct, but if you have a requirement of a fourth party, this case does not have it. I just want to concede that right up front. This one doesn't have any creditors looking at the report after the dispute. Is Ms. Webster, is she also seeking both statutory and actual damages? Yes, Your Honor. She asked that, and once again, it's not a matter of how much. It's that there are some, and there's a good faith basis for it. In this case, if you read Ms. Webster's deposition transcript that was in the record, it sets forth her testimony that supports some form of actual damages. It was in the record at RDoC 57-1 is where the deposition is, and we're relying on that. That was submitted during the summary judgment briefing because, unlike the prior case that those people argued, this case, standing was raised. It was raised twice. First, in a motion for judgment on the pleadings by the defendant, and the district court rejected that, and then again during summary judgment briefing. The district court specifically found there was a violation here, but then excused it under the bona fide error defense, so it's a different case, slightly. The district court and the parties also didn't have the benefit of Ramirez. No, we did not, and the district court solely relied on Evans. Evans, Evans, Evans, Evans, Evans, and moved on. So, unless there's other questions on standing, I'd just like to address the bona fide error defense, if that's okay with your honors. Not reading incoming faxes is not a reasonable procedure. It's a procedure designed to fail. It would be as if I told your honors right now, I am not going to listen to questions from any judge here who I've ever tried a case. I didn't tell you that. I put it on my website, or it's an internal procedure. So, Judge Hamilton, I can't answer any questions you give me, even though I hear them, they're there, I receive them. I'm just not going to answer any questions. That's a crazy procedure. In fact, it's actually contrary to the new Regulation F that the CFPB put in place, where it said, hey, you have to listen to whatever consumers tell you by whatever means. And why are these disputes being faxed? Because it's cheap, it's effective, and it gives you good proof. Okay, you send something in the mail, well, you might be able to rely on the mailbox rule. It still exists. Some judges may say, I don't know anymore. It's still a presumption, rebuttal presumption. You could send things certified mail, return receipt requested. That sometimes will work, but it's cost prohibitive. And actually, during COVID, it's become ineffective because the post office adopted a policy, you may or may not be aware of, of just not giving the green card sign. You know, certified mail, you have a green card that shows you came back. Instead, they just write COVID-19 and send the green card back, which isn't proof of delivery at all. Well, the issue of the propriety of discontinuing fax receipt of this information in favor of other methods is not really the issue. The issue is whether it was executed, you know, the new policy was executed in a complete way that guarded against these errors. Sure, and there's two ways they failed on that, Judge. Actually, three. Okay. One, it was still listed on their public-facing NMLS consumer access report, which is a thing that's multi-jurisdictional document that's there and publishes things to the public as a place where you can find contact information for debt collector. It was on the NMLS website past them being sued, well past them being sued, NMLS consumer access. Is that a government agency? I'm not familiar with that term. I saw it in the record. It's a quasi-government private agency, but it gathers up all this information on licensing because it used to be each state licensed or didn't license, and they quit reporting that. Many states quit reporting that. Indiana quit doing that. Illinois quit doing that. Instead, it's all on this MLS, and there's various parts, all kinds of parts of NMLS, but this is the one specifically for consumer access. Is this the same one that exists for real estate? It might. I don't know. The MLS? I've just accessed it for debt collection licensing. It sounds like a trade organization. It's not the real estate listing website. NMLS. Yeah, no, it's not that. It's a different deal. It's just dealing with regulation, and they've got a part for collection agencies. The second failure was- Is that something, by the way, is there any evidence, is that something your client looked to to get the fax number? My client's attorney did. Okay. And it was a number that he had done before, used before. Because these are disputes that have been sent by the attorney. Not me, but co-counsel. So that's one failure. Second failure is they didn't pull out the plug. They didn't disconnect the fax machine. So when the fax came in, they got the handshake. That's the important part here. If the fax had been disconnected, you wouldn't have got the electronic handshake saying, everything's hunky-dory, we got your message. Third way they failed is they didn't tell anybody. It was an internal policy, right or wrong, good, bad, or a different idea. They didn't tell anybody. They didn't tell- It was just removed. The fax number was removed from the website, but there wasn't any notice that that's no longer acceptable? Right. There's no longer acceptable. They said they took it off of collection letters. But this case didn't involve a collection letter. This case involved the consumer gets the credit report, sees this mark is on there. In this case, the client's really upset about this debt. She hotly contested owing these people any money. It's the typical, not just the typical, I hate the cable company. She had an actual reason for hating the cable company other than just their mere existence. You're a jury lawyer, aren't you? I think I've heard those arguments before at the district court. Sure, sure. Electronic handshake. Or I hate the mortgage company or I hate the student loan company, but she had a real reason for it. She earnestly didn't think she owed them any money and that she'd ended her service. So for those reasons, I think it's a problem for them to assert their bona fide error defense. It wasn't procedurally reasonably adapted to avoid violating the FDCPA. In fact, they adapted it in a fairly unreasonable way that was going to guarantee there'd be a problem. Unplug the fax machine. Call up John Steinkamp if you had several cases of in the past, and go, don't use that fax machine anymore. Email us, or we want mail, snail mail, as the younger people call it. Or send them an email. We want everything in email. They didn't do any of those things. This is not a reasonable procedure, and they have to prove they had a reasonable procedure, and the district court, I think, got that wrong. The district court just thought. Could I ask you, Mr. Phillips, if we agree that Ms. Webster has standing, if we agree that summary judgment was erroneous in favor of the defendant, did you move for summary judgment? Yes, and the court found that they violated the act, but then excused it. Did you move for summary judgment on the bona fide defense issue? Yes, we cross-moved. Do you think we should remand in that event for a trial on the issue, or do you think you're entitled to summary judgment? And if so, I'll take the question. You forgot I'm not listening to questions from you, Judge. I was hoping that was hypothetical, Mr. Phillips. No, Judge. I think in the two cases they're different. This case I think we win on the bona fide error, but certainly it's at worst a jury question. In the case before us, I think it was a jury question. I don't think we win outright. I think whether that was reasonable or not could be interpreted by a jury different ways. If there are no further questions, I'll sit down. Thank you. Mr. Rosenberg. Good morning, and may it please the Court. I'm Elan Rosenberg on behalf of Appellee Receivable Performance Management. If inaccurate information falls into a customer's credit file, does it make a sound? That is a quote from the Supreme Court's opinion in Ramirez when it was framing the question of standing in an action for damages for a diminished credit score when that information is not disseminated to potential creditors or other third parties. And the Supreme Court in Ramirez categorically said no. But the lawsuit there was directly against TransUnion. That is correct. And so there wasn't the issue of a debt collector being in the middle and publishing it. That is correct, Judge St. Eve. And the fact of the matter is that the Supreme Court did address this point. And the way they addressed this point is to say that in that case, the FCRA, but it's equally applicable to the FDCPA, this is not a cause of action for defamation. This is a cause of action for a statutory violation. And there is a figure akin, which is the defamation piece. However, what the Supreme Court also pointed out is that in the context of defamation, the harm that is guarded against is the injury to the reputation or the fame of the individual. It is not the insult itself. The transmission of information to TransUnion did not in any way cause Ms. Webster any damages.  Evans, we are not suggesting that Evans is completely off mark even on standing. However, under Ramirez, the real question here is the type of relief that is being sought. When the type of relief being sought is injunctive in nature, then the existence of the mark on a consumer's credit report is certainly actionable. Meaning, Ms. Webster can go into court if our client had refused to remove that blemish or correct the error and have the court declare that my client was required to do so. But in this case, where we do have a fully developed record, where we did raise the issue on summary judgment, and where Ms. Webster was in fact unable to come forward with any proof of injury to her credit, she never sought any further credit from any further creditor during the time between the notice, which my client conceitedly did not see, and the time that my client made the correction in the credit report, which it did immediately after being served with process and learning of the existence of this dispute, she never sought any credit. So there is no tangible harm. Her risk of harm was nothing more than that risk. It never materialized and it never became concrete. So what do you make of the part of the Ramirez class who did have standing simply because of the publication of that information to creditors, the third parties there? Here the third party is TransUnion or the other credit reporting agencies themselves. Well, I would disagree with that characterization, Judge Hamilton, for the following reason. In Ramirez, the publication to third parties was to people who cared about the reputation, who cared about the credit worthiness or fame of the individuals. And TransUnion's business is what? TransUnion's business is an aggregator. They aggregate information. They do not extend credit. They do not transact business with the plaintiff in this case, with the appellant. So the existence, and that is exactly why I started it out with the quote from Ramirez as I did. The fact that the blemish exists on the credit report without more is not enough to support a claim for damages. The evidence is clear that there are no real damages. There are no actual damages, and the summary judgment record supports that. So TransUnion says in footnote 6, it cites the Ostro case. Correct. In which the New York Court of Appeals tells us that dictating a defamatory letter to a stenographer can amount to publication. How is this different? Well, it is, I'll frame it this way. It is different in that the Supreme Court itself and that Justice Kavanaugh pointed out that what matters for Article 3 standing here, because this is not a defamation case, this is a statutory cause of action, and Congress can create those violations but does not excuse the plaintiff from coming forward with actual damage. Well, Congress allows statutory damages, which sounds to me a lot like damages for defamation per se. What's wrong with that analysis? Well, the Supreme Court and Justice Kavanaugh and Ramirez also address that. In that defamation per se, there is no question of the actual concrete harm. Somebody who cares... Harm to reputation without having to prove the specifics, right? You don't have to prove a loss of specific credit opportunities or anything like that under any of those categories of defamation per se. Because that information is conveyed to somebody to whom the fame or credit of the victim is a relevant consideration. How about the stenographer for the defamer? The stenographer for the defamer is simply acting in the course of employment. It's an agent. The New York Court of Appeals cited with approval by the Supreme Court, or at least with interest from the Supreme Court, says that's good enough. Correct, and the Supreme Court of the United States did not. No, there's no materiality requirement for defamation, that the defamatory material or information be defamatory and material to the recipient. I don't think that's discussed in the TransUnion case. That's correct. Not in the defamation context. So your whole argument about it has to be published to someone who cares, I think that's not an issue. I do apologize, and I'll correct myself. That is not what I intended to say, Chief Judge Sykes. What the Supreme Court did say is that in the context of credit reporting, that is what matters. Well, no, in the context of a credit reporting defendant, the difference in the statutory context here, I think, is a material distinction to use that concept, because what was at issue there was an FCRA claim, and the defendant was the credit reporting agency that had developed this new product, and was solely responsible for the inputs into the credit report that were being challenged in that case. This case is very different. It's a debt collector defendant under the FDCPA, and the violation is a clear statutory violation. The only question on the merits is whether the bona fide error defense obtains here. And so the publication analysis, to the extent that that's the pivot for the standing question here, is just the debt collector to the credit reporting agency. That's the publication. And if I may, Chief Judge Sykes, the risk of future harm is the question, whether there is actual harm or a risk of future harm. Not if the harm is the communication itself. Well, but there is no harm under Ramirez. There is no harm for a blemish in a credit report if that credit report is not consulted by a creditor or a potential creditor or third party. That is the point that Ramirez made very clearly. That the existence of a credit report and the existence of a blemish on that credit report may very well include or create a risk of future harm. That risk of future harm provides sufficient standing to seek equitable relief, but not so to seek damages. And the fact that Congress decided to include statutory damages in the absence or alternative to actual damages, the Supreme Court made clear that that will usurp Article 2. That Article 3 requires concreteness. That harm must be caused to the plaintiff. Anything beyond that simply turns the public at large to enforcers of a statute. And that is what the Supreme Court said was impermissible under constitutional principles of separation of powers. So how did the folks who had standing in Ramirez meet that standard, do you think? Because their information was disseminated to third parties. And how did that hurt them? Well, that's a good question because the case was remanded on that basis. They were found to have standing because they were accused of being a risk to national security, whether they be terrorists or drug dealers or some other nefarious type of character. But how were they hurt? They had standing, right? That is correct. In Ramirez's case, we know for certain that he was denied credit. But not for every other class member who was found to have standing, right? Correct. They may have standing, at least on the pleadings, at that stage. Whether or not they actually ultimately are able to maintain and prove that they have standing going forward is a different question. It's a question of fact and it's a question that Ramirez did not reach, nor did it need to reach at that stage in the proceedings. In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury, in fact, in Article 3. Without proving anything more than that publication, correct? The fact that their potential creditors received information that listed them as – I'm sorry. The fact that the third party potential creditors or creditors received information suggesting that all of these individuals were risks to national security does cause harm. That is a very clear definition, per se, analog. These guys are terrorists doesn't sound good to anybody. But that's not the case here. We have a plaintiff who had more than $40,000 in undischargeable, undischarged debt in collection and what already was an abysmal credit rating. There was no evidence at summary judgment that her credit rating was in any way impacted by the reporting or by the removal of the entry by RPM. So there is no concrete harm that she was able to come forward with at the summary judgment stage. I respectfully submit that we – I know I've exceeded my time and I appreciate sincerely the court's opportunity not just to let me extend my time but also for the first time in more than 20 months to be in person in court. It fills me with joy to be here despite being peppered with questions. But the fact of the matter is that we have a plaintiff who really suffered no injury. We have an appellant who truly, undisputedly did not know the existence of this debt. When it reported it – I'm sorry, had no idea, had no knowledge of the existence of this communication. When it reported the debt, this communication had not even occurred. It happened a year earlier. The fact of the matter is not one of publication here but of failure to report the dispute, which we did not know about. We cannot be accused in this particular case of defamation through an affirmative statement of a fact that was false because when RPM reported the debt in 2017, no one had disputed that debt. The fault here was purely technical. We failed to note – we failed to advise TransUnion that there was a subsequent dispute of the debt because we did not know it, because we did not see this fax. This was an e-fax situation. That is borne out by the record. There is no fax machine to unplug. Internally, they believed that they had taken all steps necessary by eliminating all references in their outward-facing media to the fax machine so that everything would go into their electronic system, which allows them to track every email, phone call, and piece of correspondence. Yes, we missed it, but the fact that there's an error doesn't take us out of the purview of the good faith error defense. In fact, without errors, the bona fide error provision would be meaningless. The fact is we took everything off. We thought we disconnected everything. When we learned upon receiving notice of this lawsuit, we took immediate action, removed the blemish from Ms. Webster's credit report. Was this the only fax that you failed to look at over those years? As far as we know, yes. That is the only dispute. Is there not a record of faxes received and confirmed? I will concede to you, Judge Hamilton. I do not know, because, number one, I focused on this case. Number two, this is, as I said, not a fax machine. The faxes were sent through third-party services, and ultimately some electronic notice would appear in some account. When we closed off, when we shut down the advertisement or publication of our fax number, we understood that we weren't going to be hearing any new disputes at that fax number, because we gave all potential debtors ample opportunity and mediums to contact us, whether it be by phone, by mail, or electronically, and dispute their debts. Yes, we made an error here, but we took the steps necessary to, number one, avoid that error from occurring in the first place. And once we learned of the existence of the error, we took immediate remedial measures by making sure that Ms. Webster's record accurately reflected the facts. But we never, ever disclosed a debt to TransUnion that in any way was false. The only time we made that statement, there was no dispute of the debt. All right. Thank you very much. Thank you all very much. Thank you. Mr. Phillips, I don't know if you had any time left. Was there time left? I do not. Okay. You may have made two quick points. That was a long argument. Sure. Counsel invites the enforcement of the statute through a declaratory judgment or injunction action in lieu of standing, or that doesn't exist in the Fair Debt Act. This court and many other courts have said there is no declaratory injunctive relief, so that's not an avenue. Now, whatever the technical means are for the fax machine to work or not to work, they didn't succeed at it. They didn't succeed at it. They didn't tell anybody. And I don't remember, Judge Hamilton, what the answer is to how many other faxes failed. They fought us tooth and nail on that, and I'd have to go back and look at the record and see if they ever produced it or if we got it or not. If I find out that there were more, I'll submit a letter. Tell you what, I think we're stuck on that issue with the summary judgment record made in this report. That's right, Judge. That's right. I'm not sure if we put anything in there. And then the other two points for both these cases are we cited this Hunstein case, which doesn't exist anymore, so you should deny our motion to cite that case. Okay? The Eleventh Circle will be telling us eventually what their opinion is on standing. Well, treat it like the advisory guidelines. Oh, no, that's not good. You don't want to go there. That's not good. No, don't do that. Thank you, Judge. And thank you, Ms. Counsel Seth, for hearing us in person. Appreciate it. Yes. Thank you very much. Our thanks to both counsel. Yes. We'll take the case under advisement.